## KINGS COUNTY LIGHTING CO. v. PRENDERGAST et al.

(District Court, E. D. New York. June 30, 1925.)

1. **Public service commissions ⊂⊃7 — Ascertainment of value of utility's property relative to rates matter of reasonable judgment on all relevant facts.**

Ascertainment, for purpose of determining reasonableness of rates, of fair value of property of public utility used in public service is not a matter of artificial rules and formulas, but of reasonable judgment, based on proper consideration of all relevant facts.

2. **Constitutional law ⊂⊃298(1)—Rates insufficient to yield reasonable return take property without due process.**

Rates prescribed for public utility, if insufficient to yield reasonable return on value of property used in service, are unreasonable and confiscatory, and their enforcement deprives utility of property, in violation of Fourteenth Amendment.

3. **Gas ⊂⊃14(1)—In fixing value of property, allowance for depreciation held sufficient, under evidence.**

In fixing fair value of gas company's property for purpose of determining reasonableness of statutory rates, held, under the evidence, sufficient was allowed for depreciation.

4. **Public service commissions ⊂⊃7—Enhanced cost of construction of plant considered on fair value for rates.**

Enhanced cost of construction of public utility's plant is to be considered in finding fair value for determining reasonableness of statutory rate.

5. **Public Service Commissions ⊂⊃7 — Going concern property for purpose of rate fixing.**

In fixing rate for public utilities, the element of going concern is regarded as property right, independent of the franchise or any good will.

6. **Gas ⊂⊃14(1)—Rate and thermal unit standard prescribed for gas companies inseparable.**

Rate and thermal unit standard prescribed by Laws N. Y. 1923, c. 899, for gas companies in New York City, are inseparable.

7. **Gas ⊂⊃14(1)—Fixing impracticable and unsafe thermal unit standard for gas is unreasonable exercise of police power.**

It is an arbitrary and unreasonable exercise of police power for statute to fix an impracticable and unsafe thermal unit standard for gas to be furnished by gas company.

8. **Gas ⊂⊃14(1) — Conclusion that prescribed standard was unreasonable supported by evidence.**

Master's finding that standard for gas prescribed by Laws N. Y. 1923, c. 899, 650 British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure, was unreasonable and arbitrary, and so unwarranted by police power, held to have support in evidence.

9. **Gas ⊂⊃14(1)—Reasonable rate of return held 8 per cent.**

A reasonable rate of return for a gas company, at present time, is not less than 8 per cent.

10. **Gas ⊂⊃14(1)—Rate limited for gas companies held confiscatory as to plaintiff.**

Maximum rate of $1 per 1,000 feet, prescribed by Laws N. Y. 1923, c. 899, for New York City gas companies, held confiscatory as to plaintiff, under conclusions as to value of its property.

In Equity. Suit by the Kings County Lighting Company against William A. Prendergast and others, constituting the Public Service Commission of New York, and another, to have declared unconstitutional and void an act of the Legislature of the state of New York, fixing the rate to be charged for gas, within chapters 898 and 899 of the Laws of 1923. On exceptions to the report of the special master. Report approved and affirmed.

The opinion of Special Master Almeth W. Hoff, dated April 15, 1925, is as follows:

"This is a suit in equity, brought by the plaintiff, challenging the constitutionality of an act of the Legislature of the state of New York, known as chapter 899 of the Laws of 1923, relating to the price and quality of gas furnished in cities of 1,000,000 or more. The plaintiff is one of the corporations affected by the said act, and the defendants are public officers charged with duties in respect to the enforcement thereof.

"Upon the institution of the suit, the plaintiff applied for and obtained from the court an injunction pendente lite. This action was referred to me, as special master, by an order of Hon. Marcus B. Campbell, United States District Judge for the Eastern District of New York, dated October 11, 1923, directing me to take the testimony and evidence upon the issues herein, make all needed computations, and fully hear the facts and report findings of fact and conclusions of law, together with the evidence.

"In accordance with the order and following conferences with the District Judge, for the purpose of arranging hearings, so as not to conflict with sessions in other like

cases, it was agreed that hearings should be held two days a week, and in accordance therewith, and by agreement of counsel, hearings were begun on December 4, 1923, and continued until June 10, 1924, in which there were taken more than 4,000 typewritten pages of testimony and 142 exhibits introduced by the parties. With my report I file a typewritten copy of transcript of the testimony, together with the exhibits.

"In accordance with the requirements of the order of my appointment and the practice and trial of rate suits in equity, I submitted to the counsel for all parties on February 26, 1925, a preliminary draft of my report and findings. On March 5, 1925, I received from counsel written and verbal suggestions and criticisms regarding such preliminary drafts. Thereafter I completed and now submit and file my report and opinion in its present form, which should be deemed to embody my findings and conclusions.

"Prior to the taking of testimony and during its progress, through their representatives, defendants were afforded by the plaintiff full opportunity to inspect and examine the property, works, accounts, and records of the plaintiff, and therefore the defendants were in a position to secure and present to me any matters they deemed of importance on the questions before me. In addition, accompanied by counsel and engineers of the parties, I visited and inspected the manufacturing plant, shops, and holder station and territory served by the plaintiff.

"This is a suit to test the constitutionality of chapter 899 of the Laws of 1923, approved by the Governor June 2, 1923, which inserted in the Public Service Commission Law (chapter 480 of the Laws of 1910) a new section, as follows:

" 'Sec. 67-a. *Charge for Gas in Cities of One Million or More.* A gas corporation engaged in the business of manufacturing, furnishing or selling illuminating gas in a city containing a population of one million or over shall not charge or receive for gas furnished or sold in such city a sum per one thousand cubic feet in excess of one dollar, nor furnish in such city gas of a standard less than six hundred and fifty British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure. The Public Service Commission, notwithstanding any other provision of this chapter, shall not allow a rate or charge in the case of such cities in excess of such sum.'

7 F.(2d)—13

"Preliminary to the passage of this act, the Legislature did not cause any investigation to be made by a special legislative committee or otherwise, or a report concerning the facts to be made by the Public Service Commission, the legislative agency charged with the duty, among others, to keep informed with respect to utilities under its jurisdiction. At the time of the enactment of this statute, the plaintiff was charging $1.30 per 1,000 cubic feet, as a maximum rate, in compliance with an order of the Public Service Commission, made on August 30, 1922, after an investigation and hearings by the commission, and was supplying gas of a standard fixed by the order of such commission at 537 British thermal units per cubic foot, with a minimum of 525, and has so continued under the temporary injunction herein granted.

"The plaintiff bases its case on the contention that the statute, if enforced, would be confiscatory, and deprive it of its property without due process of law, contrary to the Fourteenth Amendment to the Constitution of the United States. The primary question herein is whether the rate so prescribed will yield the plaintiff a fair return upon the fair and reasonable value of its property employed in the public service. A further question relates to the standard attempted to be fixed by the statute in question.

"As to the rate question, there need to be determined what is a fair return, what is the fair and reasonable value of the property, what are the proper operating expenses, and whether such expenses will leave a sufficient margin out of the proposed rate of $1 per 1,000 to afford a fair return on the fair and reasonable value of the property used and useful in the public service.

"As to the standard, it is to be determined whether it may be considered independent of and as separable from the rate provisions of the statute, and, if so, whether it is reasonable and within the police power of the Legislature to enact, or whether it is an arbitrary enactment, not justified on any of the grounds comprehended within the legitimate police powers of the state.

"Territory, Plant, and Property of Plaintiff.

"The plaintiff is a corporation organized under the Transportation Corporations Law of New York and engaged in manufacturing and selling gas for public and private use in the Thirtieth ward and a small portion of the Thirty-first ward in the borough

of Brooklyn. This territory constitutes a substantial portion of Brooklyn, and, because of the extension of rapid transit facilities has, since the war, had exceptional residential development, which is likely to continue for some years.

"Plaintiff's gasworks or manufacturing plant is located on a parcel of land fronting on the New York Bay, extending to First avenue, between Fifty-Fourth and Fifty-Fifth streets, having a total area of 462,-208 square feet, of which 286,454 square feet are used in the conduct of its business. The balance is leased to the Morse Dry Dock & Repair Company, no consideration being asked or given for such leased portion in making any determinations in this suit. At the works or plant site there are seven gas generators of a combined rated capacity of 17,400,000 cubic feet of gas per 24 hours, together with other buildings and equipment incidental to the operation of a gas plant. Its gas holders, shops, yards, and booster station are located on four parcels of land at or near Ninth avenue and Sixty-Fifth street, having a combined area of 139,843 square feet. Its gas storage holders have a capacity of 2,500,000 cubic feet. It was brought out on the hearing before me that, in order to meet the demands upon it and to adequately serve its customers, the plaintiff had contracted for and was erecting a new storage holder of 5,000,000 cubic feet capacity, but in making the findings and determinations herein no consideration is given or allowance made for the new holder. This applies likewise to a new office building and to a new booster station in course of construction. On June 1, 1923, plaintiff had approximately 205 miles of gas mains laid in the public streets, connected with the premises of its consumers by 26,168 service pipes, and had installed on such premises 50,717 gas meters. The evidence shows, and it was admitted before me, that the plant, machinery, and equipment of the plaintiff have been well maintained and are in efficient operating condition for the economical production and distribution of gas.

"Rate of Return.

"The development of the plaintiff's territory and the consequent demands for new and additional service have required and will continue to require the company to raise and invest substantial amounts of new capital in enlargement and extensions of its facilities. The situation peculiarly, therefore, is one where an adequate return is essential to the company and to the public. Additional capital must be provided to enable the company to meet the demands arising from the growth of population, but this capital will be difficult to raise if the rates charged do not afford a sufficient return to pay the annual charges of present investors and to afford confidence that such charges will continue to be paid. It appears to be settled that a utility is entitled to such rates as will afford a return sufficient to keep and attract capital, giving consideration to the risks of the business and to the return that capital, through open competition, can secure in other channels. The Supreme Court of the United States has said in Bluefield Waterworks & Improvement Co. v. Public Service Commission, 262 U. S. 679, 692, 693, 43 S. Ct. 675, 679 (67 L. Ed. 1176):

" 'A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility, and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.'

"While the Supreme Court, in 1909 (Willcox v. Con. Gas Co., 212 U. S. 19, 50, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. [N. S.] 1134, 15 Ann. Cas. 1034), held that the Consolidated Gas Company of New York was entitled to 6 per cent. as a fair return, it is generally recognized that, since the World War, the return expected and obtained by capital has materially increased. As said by the Supreme Court in a more recent case (Lincoln Gas Co. v. Lincoln, 250 U. S. 256, 267, 268, 39 S. Ct. 454, 458, 63 L. Ed. 968), after noting that costs of labor and supplies had materially advanced, 'annual returns upon capital and enterprise the world over have materially increased, so that what would have been a proper rate of return for capital invested in gas plants and similar public utilities a few years ago furnishes no safe criterion for the present or for the future.'

"The plaintiff called Edward F. Hayes, who is a member of Blair & Co., bankers, with experience in the sale to investors of securities, including utilities, and who handled the last issue of bonds of the plaintiff. He gave it as his opinion that, by comparison with other undertakings in New York City and the current requirements for capital, it was necessary for the plaintiff to show earnings of at least 8 per cent. in order to maintain and support its credit and to enable it to secure new capital in competition with the requirements for capital. He further stated that, unless the company had such earnings as to afford an 8 per cent. return, the smallness of the margin over its fixed charges would adversely affect the confidence of new investors. The bonds sold for the company by the witness yielded 6½ per cent. to the investor. In 1921, and following, the plaintiff sold to investors 8 per cent. cumulative preferred stock, and in the early part of 1924 it offered and sold 7 per cent. cumulative preferred stock. While the defendants called no witnesses on rate of return, they introduced tabulations showing offerings in utility securities and transactions in such securities on the New York Stock Exchange in 1924. Consideration of these tabulations indicates that the testimony of Mr. Hayes was sound, and I therefore conclude that 8 per cent. is a fair and proper return to adopt in this case for the plaintiff.

"Ascertainment of Value.

"This case presents the question of alleged confiscation of property and therefore involves a determination upon the elements or items of that property and the value to be adopted therefor. A company, such as the plaintiff, is entitled to earn a fair return upon the fair value of its property, and it is entitled to protection against unjust or unreasonable interference with such right by statute, or administrative or other governmental ruling. In Cotting v. Kansas City Stockyards Co., 183 U. S. 79, 91, 22 S. Ct. 30, 35 (46 L. Ed. 92), Justice Brewer said:

" 'As to parties engaged in performing a public service, while the power to regulate has been sustained, negatively the court has held that the Legislature may not prescribe rates which, if enforced, would amount to a confiscation of property. But it has not held affirmatively that the Legislature may enforce rates which stop only this side of confiscation and leave the property in the hands and under the care of the owners without any remuneration for its use. It has

declared that the present value of the property is the basis by which the test of reasonableness is to be determined, although the actual cost is to be considered, and that the value of the services rendered to each individual is also to be considered. It has also ruled that the determination of the Legislature is to be presumed to be just, and must be upheld unless it clearly appears to result in enforcing unreasonable and unjust rates.'

"In Willcox v. Consolidated Gas Co., 212 U. S. 19, 52, 29 S. Ct. 192, 200 (53 L. Ed. 382, 48 L. R. A. [N. S.] 1134, 15 Ann. Cas. 1034), the court said:

" 'And we concur with the court below in holding that the value of the property is to be determined as of the time when the inquiry is made regarding the rates. If the property, which legally enters into the consideration of the question of rates, has increased in value since it was acquired, the company is entitled to the benefit of such increase.'

"And in Bluefield Co. v. Public Service Commission, 262 U. S. at page 690, 43 S. Ct. 678 (67 L. Ed. 1176) the court said:

" 'Rates which are not sufficient to yield a reasonable return upon the value of the property used at the time it is being used to render the service are unjust, unreasonable, and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment.'

"It appears to be the settled rule that protection will be afforded against a rate that does not afford a fair or reasonable return upon the fair value of property as of the time of the inquiry. This may well mean that a new valuation must be ascertained whenever and as often as a change of rate or other interference is proposed. It might be more satisfactory of prompt determination if value were a matter of fixed accounts, capable of immediate conclusion whenever a rate question involves ascertainment of value. Such a method, however, has not been recognized, and therefore, under the rulings, it is necessary to determine each time the value of the property as of the time when it is alleged that confiscation is threatened.

"In the Minnesota Rate Cases, 230 U. S. 352, at page 434, 33 S. Ct. 729, 754 (48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18), the court has said:

" 'The basis of calculation is the "fair value of the property" used for the convenience of the public. * * * The ascertainment

of that value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts. * * * '

"The parties herein have presented the facts as to what may be termed the historical or investment cost of the physical properties, and the plaintiff has presented in detail the reproduction value of such properties as of June 1, 1923. The defendants have not aided the inquiry by evidence of such reproduction value, other than through cross-examination of the plaintiff's witnesses. Each side also produced an expert witness as to fluctuations in prices and price levels, and probable future tendencies thereof, to aid in ascertaining the present value of the property that is fair or reasonable as a rate base. In the opinion of both of these experts there is likely to be little recession from the price levels at the time of their testimony, either in respect to labor or materials, and I have accepted this theory in consideration of values herein and of continuation of operating expenses.

"The Supreme Court has indicated the elements that should be considered in arriving at a present rate basis, from Smyth v. Ames, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819, to the many cases that have reached that court within recent years. The tendency has been to give increased consideration to reproduction cost new as a basis for determining fair value. As a fixed rule has not as yet been laid down, I have given consideration to the historical or investment cost of the property, to the reproduction cost new, and I have undertaken to find a present fair value, as well as a finding as to going concern value, in order that the court may have before it these facts upon any determination of the principles that may be urged by the parties. With respect to these values, I have also given consideration to the degree of maintenance, present conditions, the range of price levels, as well as the fact that a considerable portion of the property has been installed during the period of high prices.

"Historical Cost of Structures.

"The defendants contend that the fair value should be based upon the historical costs, exclusive of land, which it is conceded should be accepted at its present value. While the cases do not justify any such strict limitation in ascertaining value, nevertheless it is a proper inquiry, in seeking to base a proper judgment, to examine original or historical costs, as well as all matters which may aid in striving to arrive at a fair determination.

"The plaintiff company, on or about July 1, 1904, merged with and became the successor of the Kings County Gas & Illuminating Company. The books and exhibits show that the total cost to the predecessor company of property existing on July 1, 1904, exclusive of land, was $2,302,997; that between July 1, 1904, and December 31, 1923, net additions to fixed capital amounted to $4,198,604, making $6,501,601, which may be said to be the original or historical cost of the structural property and plant of the plaintiff, so far as the same may be fairly ascertained, exclusive of land and working capital.

"Reproduction Cost New of Structures.

"The plaintiff produced evidence of the reproduction cost new of its property as of June, 1923. It called witnesses who testified at length and submitted exhibits giving full details of their appraisals.

"*Buildings.*—Henry R. Burt, with a long experience in the construction of buildings in and around New York City, testified that the reproduction cost new of the buildings was $752,134.

"*Gas Mains and Service Pipes.*—John H. Duncan, who for several years has had the contract with the plaintiff for the laying of mains and services, testified with respect to the distribution system, basing his testimony upon his actual experience in the laying of a considerable part of such distribution system. He testified that the reproduction cost new of mains was $2,898,617, and of service pipes $1,109,686. The size and length of mains and services were testified to by the former superintendent of distribution of the company, who through his long service with the company was personally familiar with the entire distribution system. Mr. Duncan further estimated that the cost of restoring present street paving over gas mains and services was $1,444,347. A very great part of such paving, however, was laid after the installation of the distribution system, and, while cost of restoring existing paving over mains might conceivably be a part of reproduction cost new of a distribution system as of a particular date, the plaintiff has asked that there be included in the value of the company's property only the cost actually incurred by the plaintiff, from time to time, in restoring such paving as had actu-

ally been cut in extending the distribution system. The books of the company showed that, as of June 1, 1923, this amounted to $97,696.65.

"*Manufacturing Apparatus and Holders.* —Col. Alten S. Miller, called as a witness as to gas equipment and general overheads, is an officer of the Bartlett Hayward Company, a corporation extensively engaged in supplying equipment and apparatus needed by gas companies, that has furnished a considerable part of plaintiff's equipment, and at the time of hearings was erecting a new gas holder for plaintiff. He testified that the reproduction cost new of machinery and equipment, including gas holders in use, was $1,590,291.

"*Overheads.*—Col. Miller also testified that there should be allowed, from the point of view of a general contractor, supervising all of the construction work, 13 per cent. on the cost of machinery and apparatus and buildings and appurtenances and 5 per cent. on mains and services for engineering, superintendence, and general contractor's expense and profit; that there should be allowed for administrative, legal, and miscellaneous general expense during construction 2½ per cent. on the cost of all property except meters; that interest at the rate of 8 per cent. for one year should be allowed for interest during construction on the cost of all structures, except meters and installation of meters, and that there should be allowed for taxes during construction $25,-646.04, which is one-half of the annual taxes in 1921.

"Col. Miller testified that he had not computed depreciation in his estimate of his reproduction new costs, for the reason that the property by reason of adequate current maintenance was as good as new, and therefore able to perform fully the functions for which the items of property were intended. He and Mr. Burt submitted lists of minor items of repair that should be made to restore the properties to complete condition, totaling $1,855.50 on buildings and $16,557.-92 on machinery, apparatus, and equipment. He stated that, while the property was as good as new, an examination at any given date would show similar items of repair that are really matters of routine maintenance. The mains and service pipes have an indefinite life, with occasional repairs such as are necessarily being done as current maintenance.

"The defendants produced no witnesses upon reproduction costs. It has therefore been necessary for me to rely entirely upon the testimony of the plaintiff's witnesses upon this subject, modified by cross-examination. The defendants have objected to Col. Miller's estimates of overhead allowances. When it is borne in mind that Mr. Burt, on buildings, Mr. Duncan, on distribution system, and Col. Miller, on equipment, included percentages for certain overheads, including contractor's profit, it has seemed to me that Col. Miller's allowances for general overheads are unduly liberal and beyond what would be required. I have therefore used 5 per cent. in the place of his 13 per cent., 2 per cent. instead of 2½ per cent. for administrative, legal, and miscellaneous general expenses during construction, and 6 per cent. instead of 8 per cent. for interest during construction and taxes in the amount testified to by Col. Miller.

"*Meters.*—A. J. Gonnoud, auditor of the plaintiff company, testified from the records of the company as to the prices paid for meters. At the prices actually paid in June, 1923, the reproduction cost of meters on consumers' premises June 1, 1923, was $527,-071.23, and in stock $24,943.24. Col. Miller testified that the reproduction cost of installing the meters installed by plaintiff at its own expense was $264,855.50. The costs so given by Col. Miller were in agreement with the actual expense of installations made in 1923. The total for meters and installation of meters is $816,870. It appears that meters are removed and overhauled regularly in accordance with a schedule, and that they are therefore always in a condition as good as new.

"Summarizing the foregoing, it would appear that the value of the above property upon a reproduction basis, treated in the manner indicated for the purpose of being considered as part of a proper rate base, may be fairly set down as follows:

| | |
|---|---:|
| Buildings | $ 750,278 |
| Mains | 2,898,617 |
| Services | 1,109,686 |
| Gas apparatus | 1,573,733 |
| Engineering, superintendence, general contractor's expense and profit | 317,536 |
| Interest during construction | 421,623 |
| Taxes during construction | 25,646 |
| Administrative, legal, and miscellaneous general expense during construction | 127,014 |
| Meters and installation of meters.. | 816,870 |
| | $8,041,003 |

"*Paving over Mains.*—As before noted in reviewing Mr. Duncan's testimony in rela-

tion to mains and services, he testified in his reproduction estimate that to restore present street paving over mains and service connections would cost $1,444,347. For the reason there pointed out, that most of the distribution system of the plaintiff had been installed in dirt streets before paving, the plaintiff has asked that only the amount actually expended by it in restoring paving actually cut be included in a valuation of its property. This seems only fair and proper. The amount is $97,696.65.

"*Miscellaneous General Equipment.*—As additional physical property the company has laboratory apparatus, office and storeroom furniture and fixtures, stable and garage vehicles and accessories, and small tools which have cost the company, according to its accounts, $102,541.

"*Additions Subsequent to June 1, 1923.*—In addition to properties included above, the plaintiff expended between June 1 and December 31, 1923, for additions, extensions, and improvements, $565,414.25 in excess of the cost of property withdrawn from service during that period.

"For its general and branch offices, the company occupies leased premises, but Mr. Bucher, its vice president, testified that a plot had been acquired for the company upon which to erect at considerable expense a modern office building, deemed necessary to accommodate the business and employees of the company. Although he stated that this building would be started during 1924, I have not included any allowance therefor. Other construction work in progress in 1924 was the building of a booster station and the erection of a new 5,000,000 cubic feet gas holder, for which no allowances are included.

### "Land.

"The plaintiff produced two witnesses, David Porter and Lewis H. Pounds, as expert witnesses on the value of real estate owned and used by the company. Both of these witnesses have high standing in the appraisal and handling of real estate in Brooklyn. The defendants called no witnesses on the value of such real estate, other than city assessors, who testified as to the assessed valuation of such property. The plaintiff's manufacturing plant is located between first avenue and the water front and Fifty-Fourth and Fifty-Fifth streets, being an important parcel in this stretch of water front of New York Bay, which is entirely developed. With the care and consideration obviously given by the plaintiff's two witnesses to the relative valuation of water front properties and their experience and standing, I am convinced that their valuation of this water front property should be accepted. A portion of the property owned by the plaintiff is leased to another concern, and is therefore not used in the gas business. The value of such leased portion has accordingly been excluded from present consideration, and I find the value of the portion used by plaintiff in its gas business to be $811,650.

"The plaintiff has its holder stations, shops, and yards in the center of its district, using the parcels of land comprising the four corners of Sixty-Fifth street and Ninth avenue. Certain other parcels, not now in use for gas purposes, have not been considered. Messrs. Porter and Pounds testified, with respect to the properties used by the company at Ninth avenue and Sixty-Fifth street, that gas holders are prejudicial to the value of surrounding land, which in turn depresses the assessed valuation of the plaintiff's real estate itself. They stated, therefore, that they had disregarded the existence of gas holders in arriving at a proper valuation of such real estate, just as they disregarded the existence of the gas plant on the water front property and its special advantages for gas-making purposes. They therefore based their estimate on comparison with value of other land similarly situated with relation to transit facilities. On such basis they fixed a total value of $182,352. I am convinced that the assessed valuation does not in any way represent the value of such real estate as it should be considered in this case, and that it should be considered as land free of the existing structural property of the company, just as the water front property was considered by the witnesses, as water front property without regard to its peculiar and special value to the plaintiff for gas-making purposes. In the latter case, this company should not be given a special value for its water front property, nor penalized in the former case for detriment. I have therefore accepted the witnesses' valuation in this instance also, making the total value of the land used by plaintiff in its gas business, $994,002.

### "Working Capital.

"The company is entitled to have an adequate working capital to provide, promptly, materials and supplies, current maintenance, and repairs chargeable to operating expense, and other contingencies, so as to permit the company to carry on its operation as a go-

ing concern without delay or extra expense. It must have an adequate cash and credit standing. The proper allowance may be deduced from the actual experience of the company, supplemented by opinion evidence. Paul Bucher, treasurer of the plaintiff, testified that the actual average monthly working capital during the year 1923 was $868,372.47, made up of average monthly working capital as represented in the following accounts:

| | |
|---|---|
| Accounts receivable | $303,988.60 |
| Material and supplies | 219,233.80 |
| Cash | 195,142.20 |
| Gas supplied, but not billed | 125,000.00 |
| General storeroom expense | 12,162.40 |
| Coal handling suspense | 649.68 |
| Prepaid insurance | 5,837.41 |
| Prepaid taxes, etc | 5,358.38 |
| Deposits—public authorities performance of contracts | 1,000.00 |
| | $868,372.47 |

"Col. Miller, for the plaintiff, testified that in his judgment $855,227 should be allowed for working capital.

"For the defendants, Mr. Little presented the figure of $446,051 as his estimate of an adequate working capital. Mark Wolff, an accountant witness for the defendants, based his conclusion, that $496,142.04 was the proper allowance, on the difference between the total current assets and total current liabilities for the year 1923, and the defendants have argued that such rule should be the proper test for the ascertainment of working capital. They have also called attention to consumers' deposits, totaling $423,020, and to certain special deposits and reserves, with the suggestions that they should be given consideration in determining working capital. Considering the various items of current assets and liabilities, and other items to which attention has been called, and having regard to the current requirements of the company, including considerable construction work, I am of opinion that $600,000 should be allowed as working capital.

"Going Value.

"The plaintiff, in support of its claim to an allowance for going value, examined Col. Miller, who testified that, based upon his knowledge and experience, there existed a value to the plaintiff, as a going concern, of $1,750,000 over and above the value of the tangible property. He arrived at the value upon a base of approximately $35 per meter in service. Col. Miller stated, as his definition of such element of value, that it was 'the difference between the value of an op-

erating property with an organized plant and personnel, and serving its customers and having regular dealings with them, and a plant which is merely built and not operating, having no customers, and doing no business.'

"This question has been before the courts in a number of rate and acquisition cases, where the rulings have been such as to require consideration and determination of the plaintiff's claim. The defendants contend that no allowance is to be made thereon. If the claim involved capitalization of early losses merely, it might be disregarded; but the plaintiff claims that, between a completed plant merely ready for business and a completed plant serving the entire community, there has been a cost to the company, that should be allowed, of creating and developing that business, and of adjusting and fitting its personnel and properties thereto. In the assumption of a reproduction of an existing and going concern, it is presumed that the community exists, with all facilities except the one in question, and that within a fixed period of time the entire property is created. If it be a gas property, it cannot necessarily be assumed that the residents are anxious and ready to take the service, for they presumably have in service other means of providing the service otherwise to be rendered by gas. They must be persuaded to have their homes piped, to discard coal stoves and furnaces as means of providing heat, all matters of expense to them, for which they must be shown that there are superior advantages. Even at the present time the company maintains a force to persuade residents to use additional appliances and to substitute gas for other means of cooking, hot water supply, and heating. I have no doubt that in extending the use of gas for industrial purposes considerable expenses are incurred in salesmanship to industrial managers. There seems no difficulty, therefore, in understanding that there is a value involved in the difference between an inert property and a going property.

"In National Waterworks Co. v. Kansas City, 62 F. 853, 865, 10 C. C. A. 653, 665 (27 L. R. A. 827), Mr. Justice Brewer dissects this question in the following language:

" 'It is obvious that the mere cost of purchasing the land, constructing the buildings, putting in the machinery, and laying the pipes in the streets—in other words, the cost of reproduction—does not give the value of the property as it is to-day. A completed

system of waterworks, such as the company has, without a single connection between the pipes in the streets and the buildings of the city, would be a property of much less value than that system connected, as it is, with so many buildings, and earning, in consequence thereof, the money which it does earn. The fact that it is a system in operation, not only with a capacity to supply the city, but actually supplying many buildings in the city—not only with a capacity to earn, but actually earning—makes it true that "the fair and equitable value" is something in excess of the cost of reproduction. * * * Such a system would be a dead structure, rather than a living and going business. The additional value created by the fact of many connections with buildings, with actual supply and actual earnings, is not represented by the mere cost of making such connections. Such connections are not compulsory, but depend upon the will of the property owners, and are secured only by efforts on the part of the owners of the waterworks, and inducements held out therefor. The city, by this purchase, steps into possession of a waterworks plant—not merely a completed system for bringing water to the city, and distributing it through pipes placed in the streets, but a system already earning a large income by virtue of having secured connections between the pipes in the streets and a multitude of private buildings. It steps into possession of a property which not only has the ability to earn, but is in fact earning. It should pay therefor not merely the value of a system which might be made to earn, but that of a system which does earn.'

"The Supreme Court, in Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 165, 35 S. Ct. 811 (59 L. Ed. 1244), referring to and recognizing this element of value, says:

" 'That there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced, is self-evident. This element of value is a property right, and should be considered in determining the value of the property, upon which the owner has a right to make a fair return when the same is privately owned although dedicated to public use.'

"See, also, Omaha v. Omaha Water Co. 218 U. S. 180, 30 S. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084; Denver v. Denver Union Water Co., 246 U. S. 178, 38 S. Ct. 278, 62 L. Ed. 649.

"Again, in State P. U. Com. v. Springfield Gas & Elec. Co., 291 Ill. 209, 230, 125 N. E.

891, 900, the court, in affirming a judgment which reversed the commission, which had made no allowance for going value, states the rule of law applicable thereto as follows:

" 'This element of value is always present in every assembled and established plant doing business and earning money. It is a property right, and must be considered by the commission in determining the value of the property upon which the utility has a right to make a fair return.'

"In Kings County Lighting Co. v. Willcox. 210 N. Y. 479, 104 N. E. 911, 51 L. R. A. (N. S.) 1, the court clearly recognized going value as an item to be appraised and included in a rate base. While certain phases of this decision may be considered to have been disapproved by the United States Supreme Court in Galveston Electric Co. v. Galveston, 258 U. S. 388, 42 S. Ct. 351, 65 L. Ed. 678, yet the main principle that going concern value must be valued and allowed, when properly presented and supported, was not disturbed.

"See, also, the recent case of N. Y. Telephone Co. v. Prendergast (D. C.) 300 F. 822, 826, where the court held: 'The denial of any allowance for going value was also error of law. * * * There has been, and probably will continue to be, much difference of opinion as to how to measure this kind of property; but in its nature it is a mere function or attribute of successful co-ordinated effort. A garment is made out of cloth and silk, buttons, and thread, and by labor; but when completed and well made its value is more than the aggregate cost of the items. It is a going concern, and as such has going value.'

"A number of cases have been cited to me in which such going value has been determined at figures which were from 10 to 30 per cent. of ascertained value of the physical property. While it is true that in some cases this element of going concern value is considered with and made a part of the estimates of structural values (Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 35 S. Ct. 811, 59 L. Ed. 1244; Galveston Electric Co. v. Galveston, 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678), in the present case it was considered and estimated separately as seems to be the more general practice.

"It is obvious that the element of value as here considered cannot readily be proved by direct evidence because of the intangible nature of such element of property. Opinion evidence is therefore of value. Col. Miller is a man of wide experience, with a

knowledge of the development and mainte-- nance of a gas business that qualifies him to present an opinion that is entitled to weight. I have considered carefully his testimony in this respect, and, in connection with my con-- clusion on the value of other elements of property herein, I deem an allowance of $800,000 as reasonable for going value to be considered as a part of the rate base herein.

### "Fair Value.

"The plaintiff has urged that the reproduc-- tion cost of its structural property should be taken as the fair value in determining whether the proposed rate will give a fair and reasonable return thereon. In support of this claim the plaintiff presented separate-- ly and in detail the structural property, and introduced evidence, uncontradicted, of the reproduction cost of such property as here-- inbefore referred to. I am convinced, from the standing of the witnesses and the thor-- ough examination and cross-examination of them as to details of their appraisals, that such appraisals represent, as nearly as could be ascertained, what it would cost to produce a gas property identical with the plaintiff's at prices for labor and materials prevailing in June 1923, if undertaken by a gas com-- pany already organized, with a franchise and possessed of adequate capital.

"There is much force in the plaintiff's con-- tention that such reproduction costs repre-- sent actual costs through application of pres-- ent day index number to costs incurred dur-- ing the period preceding the high price level; that is, because of the depreciated value of the dollar, the structural reproduction cost represents what it actually did cost the com-- pany in the dollar of to-day to install such property. The aggregate reproduction cost before stated is $8,041,003. The actual or historical costs, with present day index No. 150 applied only to the cost of the property installed prior to December 31, 1915, are shown below.

| | |
|---|---|
| Cost to plaintiff's predecessor of property existing June 30, 1904, exclusive of land............. | $2,302,997.40 |
| Net additions to fixed capital, June 30, 1904, to December 31, 1915 ...................... | 1,316,775.54 |
| | $3,619,772.94 |
| Applying index No. 150........ | 5,429,659.41 |
| Net additions to fixed capital, De-- cember 31, 1915, to December 31, 1923...................... | 2,881,828.15 |
| | $8,311,487.56 |

"While this method cannot be accepted as an infallible rule, nevertheless it is a check on the reasonableness of the estimated pres-- ent-day reproduction costs. This original cost, as thus adjusted by the application of the index number, is greater than the repro-- duction cost, as heretofore modified and stat-- ed herein. The difference is in part account-- ed for by the fact that the cost of restoring pavement actually cut in the laying of the mains is included in the original cost figure, while there is no allowance for pavement in the reproduction figure of $8,041,003 found herein.

"Giving consideration to the various mat-- ters herein discussed, and to the authorities applicable thereto, a few of which I have cited, I have come to the conclusion that the fair value of the plaintiff's property em-- ployed in the public service herein is as fol-- lows:

| | |
|---|---|
| Land ............................ | $ 994,002 |
| Plant, distribution system, and oth-- er structural property........ ...... | 8,041,003 |
| Restoring street paving over mains and services cut in laying same.. | 97,696 |
| Miscellaneous general equipment . | 102,541 |
| Working capital.................. | 600,000 |
| Going value..................... | 800,000 |
| | $10,635,242 |
| Cost of net additions to fixed capi-- tal June 1 to December 31, 1923.. | 565,414 |
| Fair value as of December 31, 1923. | $11,200,656 |

"This fair value of $11,200,656 is not what it would cost to reproduce as an entirety the plant and property of the plaintiff. In the reproduction of such property there would be the expense of organization and develop-- ment prior to construction, which Col. Miller estimated at $650,000. There would be the cost of financing, which he estimated at the sum of $680,000. There would be interest and taxes on land during construction, be-- sides numerous other items which I have not included. To organize a corporation, secure the necessary capital, and construct the plant as the same existed June 1, 1923, including working capital, but exclusive of going con-- cern value, Col. Miller testified would cost $13,694,371. Adding his independent esti-- mate of going value, $1,750,000, increases his estimate to $15,444,371. No testimony in contradiction of these estimates was given. While I have given due consideration to Col. Miller's estimate of reproduction cost of the plant and property as a whole, I have en-- deavored to ascertain, and the figures found by me attempt to reflect, what it would have cost the plaintiff to build and develop its plant and property as it was built and de-- veloped, had the same level of prices for ma--

terials and labor prevailed throughout the whole period of its construction as prevailed in June, 1923; in other words, to measure and state the investment in the property in the dollar of the present.

"Counsel for the Attorney General has urged that there should be taken into account and deducted the amount of the reserve set up by the company in the retirement account known as 'Plant Withdrawn from Service.' This retirement reserve amounted, at the end of 1923, to $201,910, and had been built up over a period of years by charging to operating expenses a sum equal to 3 cents per 1,-000 cubic feet of gas sold.

"Several cases have been cited in support of this contention, among them the decision of the Michigan Public Utilities Commission in the Case of Michigan State Telephone Company, P. U. R. 1923A, p. 30, and the decision of the Public Service Commission of the state of New York in the case of the New York Telephone Company, P. U. R. 1923B, 545. I refer particularly to 'these two cases, which have been cited by the defendants' counsel, because the rulings of the Michigan commission and the New York commission on this very point have been reversed by the federal courts in cases which were brought following those rulings by these commissions. The view taken by the New York Public Service Commission upon this point was reviewed by the special statutory court in the Southern district of New York, which is in this circuit, in New York Telephone Co. v. Prendergast (decided July 26, 1924) 300 F. 822, where the court expressly held that the ruling of the commission deducting the reserve was erroneous, saying (pages 824, 825):

"'These accumulated charges are not a separate fund. The total bears no definite relation to the actual condition of the property; for one item may have been and was charged years ago against the cost of an article scrapped long since, while another was charged yesterday against one just entering upon its life of usefulness. In fact, the depreciation reserve is a piece of bookkeeping, a monthly charge against earnings, to provide means, not only of covering deterioration from use and time, but of minimizing, and only minimizing, future possible losses of any kind, from storm or fire to changes of fashion. The funds or credits thus reserved are, and always have been, expended in strengthening the company's useful property, but what particular property it is neither possible nor useful to ascertain. * * *

"'To deduct from the fair value of plaintiff's property the entire book reserve for depreciation, in order to reach a rate base, was error of law. * * * The book charges represent what observation and experience suggested as likely to happen, with some margin over. The legal error is in not recognizing that the law requires deduction only for actual depreciation, just as actual as the present value, and the extent of that depreciation must be ascertained by the same kind of evidence; in the last analysis, opinion based on contemporary investigation.'

"The following recent cases likewise seem to be authority for holding that the retirement or depreciation reserve, by whatever name designated, being merely a book account, is no evidence of the extent of depreciation and should not be deducted in arriving at fair value; that the entire property must be valued regardless of the amount of such reserve: People ex rel. Penn. Gas Co. v. Public Service Commission, 204 App. Div. 73, 76, 198 N. Y. S. 193; Bronx Gas & Elec. Co. v. Public Service Commission, 28 N. Y. State Dept. Rep. 329, P. U. R. 1923A, 255, affirmed, without opinion, 208 App. Div. 780, 203 N. Y. S. 922; Monroe Gaslight & Fuel Co. v. Michigan Public Utilities Commission (D. C.) 292 F. 139; Michigan Public Utilities Commission v. Michigan State Telephone Co. (decided October 30th, 1924), 228 Mich. 658, 200 N. W. 749, 25 Rate Research, 407.

"I therefore feel constrained by the weight of authority to hold that it would not be proper for me to deduct from the amount found by me as the fair value of the property of the plaintiff the credit balance in the retirement reserve kept by the plaintiff. In finding the reproduction value of the plaintiff's property, I have, however, deducted the amount which was testified as representing the expenditures necessary to place or restore the physical property of the plaintiff in a condition as good as new. The plaintiff's witnesses testified that there was no depreciation beyond these amounts. No testimony was presented in behalf of the defendants conflicting with the testimony of the plaintiff's witnesses on the question as to the condition of the plaintiff's property and of any actual depreciation existing therein. There is no substantial evidence in the record to the contrary of that testified to by the plaintiff's witnesses.

"Ohio Utilities Co. v. Public Utilities Commission of Ohio, 267 U. S. 359, 45 S. Ct. 259, 69 L. Ed. 656, decided by the United States Supreme Court, March 2, 1925, is

significant on the question of the weight to be accorded the testimony of experts where there is no contradictory evidence.

## "Operating Expenses.

"The plaintiff manufactures carburetted water gas at its water front plant, whence it is distributed through its mains and distribution system to its consumers throughout the district served. The plaintiff keeps and maintains very complete and detailed books and records showing its operations and dealings. Both before and during the trial these were accessible to the defendants, and their accountants did, in fact, inspect and study them. In the course of the examination of witnesses many of the books and records were produced before me, and as required, or requested, original records were produced throughout the hearings. The plaintiff presented detailed evidence in respect to its operating expense during the year 1923, including the methods of handling the material necessary to the making of gas and the charging of all items of expense in accordance with the uniform system of accounts prescribed by the Public Service Commission. During the year 1923, the plaintiff manufactured 1,977,410,000 cubic feet of gas, and its sales were 1,794,969,872 cubic feet. The total cost thereof, including expenses incident to the sale of gas appliances, in manufacturing and distributing gas was $1,640,279.49, or 91.38 cents per 1,000 cubic feet of gas sold, made up as follows:

|  |  | Cts. Per M. |
|---|---|---|
| Production expenses | $ 892,501.13 | 49.73 |
| Distribution expenses | 143,636.40 | 8.00 |
| Street lighting expenses | 915.94 | .05 |
| Commercial expenses | 124,461.36 | 6.93 |
| Promotion expenses | 49,423.58 | 2.75 |
| General expenses | 156,651.13 | 8.72 |
| Retirement expense | 53,990.21 | 3.00 |
| Federal income tax | 68,303.61 | 3.81 |
| Other taxes | 140,987.02 | 7.86 |
| Uncollectible bills | 9,409.11 | .53 |
| Total operating expenses | $1,640,279.49 | 91.38 |

"The defendants have not questioned the fairness or reasonableness of such operating costs. In fact, Mr. Little, the only witness called in the matter of operating expenses, commended the excellent condition of the property and the efficiency of its personnel and operation. They did, however, call attention to two items. One of these relates to the charging and crediting of the cost of tar boiler fuel. In the use of oil in the making of gas, there is a certain amount of tar recovered as a residual, which may be sold or made use of by the company as boiler fuel in place of purchased boiler fuel. As it is recovered, it is the practice of the company, which has continued for some years, to credit such recovered tar at the price per gallon paid for the oil in use at the time of recovery. When it is used as boiler fuel, it is charged at the price at which it was credited when it went into storage. During the year 1922, there was a considerable quantity of tar recovered, a portion of which was not used until the calendar year of 1923. The oil price under the 1923 contract for oil was a little less than that for 1922, and the defendants contend, therefore, that tar should be charged at the price of oil at the time when the tar is used. In accordance with this contention, there would therefore be a slight reduction of operating expenses during 1923.

"I am unable to see the force of this contention. The company is following a practice, extending over a period of years, under which the tar is credited at the oil price current at the time of recovery and charged at the same price when used. This may result in the charge price being higher or lower than the oil price on a given date, depending upon whether the tar in storage was recovered at a time when the price of oil was higher or lower. In the long run it does not make any difference whatever, for it means that all of the oil, including the tar residual, is used up in the making of gas, and under its practice is charged at the cost price. Furthermore, the company showed that, at the price charged for such tar used as boiler fuel, the cost was less than would have been the equivalent of coal boiler fuel which the company would need to have purchased, had the tar not been available as fuel.

"Although bearing only slightly on this point, the defendants have commented on the low percentage of tar recovery during 1923 and urged that it should have been higher. I am unable to see the force of this. Gas engineers, in the making of gas, do not strive to produce a recovery of tar. On the contrary, the more efficient the process of gas manufacture is, the more complete is the breaking up of the oil, and the less there is of residual. Any comparison with a higher percentage of tar recovery by other companies is apparently a comparison in relative efficiency of manufacture.

"The other point of criticism by the defendants is the charge of 3 cents per 1,000 cubic feet to an account known as "Plant Withdrawn from Service," a retirement account, and so designated in the above table. Mr. Little, for the defendants, testified that

he had made an examination of the accounts of the plaintiff covering a period of years, for the purpose of ascertaining the actual amount of retirements charged to this account, which, on the average, amounted to a little less than 1 cent per 1,000. The amount credited to this account at the end of 1923 was $201,910.62, which is the net aggregate resulting from the charge of 3 cents per 1,000 over a period of years. Mr. Little recognized the need of making a charge to operating expenses to take care of plant withdrawn from service, but contended that the result of his examination of the account indicated that a charge of 3 cents was in excess of the actual experience of the company, and was not needed. I am inclined to agree with him on this point on the evidence presented before me, and therefore conclude that, for the purposes of determining the questions involved in this case, such charge should be taken at 1½ cents.

"The gas furnished and sold by the plaintiff during the year 1923 showed a monthly average of heat content slightly above the standard of 537 monthly average prescribed by the Public Service Commission. This appears to be good practice, for, because of fluctuating temperature and other conditions, it is necessary to manufacture gas of a heat content above the prescribed standard to insure the furnishing to consumers of gas in compliance with the standard. In the manufacture of this gas, the plaintiff used 2.83 gallons of gas oil, 33.98 pounds of generator fuel, and 5.24 pounds of solid boiler fuel per 1,000 cubic feet of gas made. In order to produce a gas of a higher heat content, it is necessary to use an additional quantity of gas oil, which results in a reduction in generator and boiler fuel, and an increase in the amount of tar recovered.

"In considering the quantities of material necessary to produce a standard of 650 British thermal units, it is necessary to rely upon opinion evidence, for the reason that the witnesses were unable to cite, within their own experience and knowledge, any situation where a gas company had undertaken, for a considerable period of time, the manufacture of gas with such a high heat content. It seems safe, however, from the testimony before me, to assume that to furnish gas at 650 British thermal units would require not less than 4.65 gallons of gas oil, 32 pounds of generator fuel, and 3.98 pounds of solid boiler fuel per 1,000 cubic feet of gas made, with a tar recovery of approximately 16 per cent. of the amount of gas oil used. Applying the cost figures of 1923 to these items indicates that to make gas of a standard of 650 Brit-

ish thermal units would increase plaintiff's costs 5.44 cents per 1,000 cubic feet.

"As itemized and shown in the findings accompanying this opinion, the operating costs, exclusive of federal income tax, and by reducing the retirement expense from 3 to 1½ cents, become 86.08 cents per 1,000 cubic feet of gas sold in 1923, at the 537 British thermal unit standard, and adding the 5.44 cents, as the additional cost of making 650 British thermal unit gas, gives 91.52 cents per 1,000 as the cost, had the plaintiff undertaken to furnish gas of the higher standard.

"*Operating Expenses for 1924.*—On the hearing of the objections to my tentative report, plaintiff, at the request of one of the defendants, furnished for the record the amount of its sales of gas in the 12 months ended December 31st, 1924. Such sales were 1,947,207,840 cubic feet, an increase of 152,-237,968 cubic feet over the sales of the previous year. The chief items in the expense of producing gas are the costs of materials used, labor, and taxes. The assessed valuation of real estate and improvements is fixed, so that taxes therefore can be ascertained. The cost of labor is unlikely to change. The materials used in the making of gas are gas oil and coke, for which the company makes contracts. As the company has now reached the point of large production volume, it appears that any increase in sales will not reduce the unit cost of making and furnishing gas. Consequently any changes in the operating expense per unit are limited to those caused by differences in the cost of materials.

"The company was able to secure contracts for its supply of gas oil and generator fuel for 1924 at slightly lower prices than it had in 1923. Applying these reductions to the unit cost of 1923 shows a reduction of approximately 1.58 cents per 1,000. So that, if the plaintiff had operated in 1923 under the oil and coke contracts made for 1924, the total operating costs would have been 84.50 cents per 1,000 of gas sold, which may be taken as the total of operating expenses for 1924 to be considered herein, with a corresponding reduction in the assumed operating expenses for the making of gas of a standard of 650 British thermal units. Each of the expert witnesses produced by the parties on price levels agreed, furthermore, that there were no indications of lowering prices for a considerable period.

"Mr. Little undertook to make a forecast of probable operating expenses for the year 1924 by setting forth the exact amount of money required for each of the 60 accounts

included in operating expenses, although he presented no criticism of operating expenses of 1923, other than as above indicated. It would appear, from the nature of the gas business and the method of keeping accounts, that it may be difficult to assign a particular sum of money for each item of expense for the year, but that the total cost per 1,000 for each item of expense may be forecast from the experience of the company and the price paid for labor and materials. I have therefore taken the above figure of 84.50 cents per 1,000 cubic feet of gas sold as the proper cost of gas for the year 1924 at the 537 British thermal unit standard actually furnished, and 89.94 cents per 1,000 as the cost during that year, had the plaintiff undertaken to furnish a 650 British thermal unit gas.

"In the operating expenses, but not segregated in the books of the company, are included expenses for conducting the business of selling gas appliances. It is the practice of this and other gas companies to conduct such business, partly to aid consumers in securing gas appliances manufactured under standard specifications that will thus render most efficient service to the consumers, and partly, by thus promoting the sale of appliances to be used for additional purposes, to increase the sale of gas. A company, in order to secure these advantages, may sell such appliances either at actual cost or at a slight advance, crediting to revenue the amount realized therefrom. During 1923, the plaintiff derived therefrom and from other sources, a revenue of 4.57 cents per 1,000. In all calculations made herein, as specifically shown in the findings, this item has been added as an operating revenue and computed accordingly.

"Return to the Company.

"For the year 1923, with the above operating expenses of 86.08 cents per 1,000 cubic feet of gas sold at the prescribed rate of $1 per 1,000, plus the miscellaneous operating revenue of 4.57 cents per 1,000, making a total revenue of 104.57 cents per 1,000, there would be left 18.49 cents per 1,000 as a return to the company. Applying this to the 1,794,969,870 cubic feet of gas sold gives $331,876.82. Federal income tax in the sum of $2,848.81 would be payable, leaving $329,028.01 available for return on property. Had the company undertaken to furnish gas of 650 British thermal units, the corresponding net return to the company would have been 13.05 cents per 1,000, or a total of $234,230.26, with no income tax payable.

"For the year 1924, with the operating expenses 84.50 cents per 1,000 cubic feet of gas sold at the prescribed rate of $1, plus the miscellaneous operating revenue, there would be left 19.71 cents per 1,000 as a return to the company. Applying this to its sale of 1,947,207,840 cubic feet in 1924 gives $383,775.53. Federal income tax in the sum of $9,336.15 would be payable, leaving for return on property $374,439.38. Had the company undertaken to furnish gas of 650 British thermal units in 1924, the net return to the company would have been 14.27 cents per 1,000, or a total of $277,847.39, with no income tax payable.

"Thus, the return of $329,028 in 1923 for gas of the standard actually furnished, 537 British thermal units, would be an 8 per cent. return on only a value of a little over $4,000,000, or a 6 per cent. return on approximately $5,500,000.

"The Public Service Commission, defendant herein, admitted in its answer a value, of approximately $7,500,000, and the Attorney General has urged a finding of present cost of not to exceed $7,500,000. On any basis, therefore, of value or rate of return, the return for 1923 does not constitute the fair return to which the company is entitled. On the basis of the fair value of $11,200,656 as found by me, the above return is only 2.94 per cent. thereof. Had the company furnished gas of 650 British thermal units during 1923, the return of $234,230 is 8 per cent. on less than $3,000,000, 6 per cent. on less than $4,000,000, and only 2.09 per cent. on the fair value of $11,200,656. Consequently the proposed rate of $1 per 1,000 cubic feet must be deemed confiscatory as to 1923.

"For 1924, a return of $374,439.38, would have been 8 per cent. upon a value of a little over $4,600,000, a 6 per cent. return on less than $6,150,000, and 3.34 per cent. on the fair value as herein found, without consideration of fixed capital installed during 1924 in addition to the fair value as of December 31, 1923. Had the company been furnishing gas of 650 British thermal units during 1924, the return of $277,847.39 would have been an 8 per cent. return on only $3,400,000, a 6 per cent. return on only $4,600,000, and 2.48 per cent. on the fair value found as of December 31, 1923. The statute must therefore be deemed to impose a rate that is confiscatory as to 1924.

"Gas Standard.

"The statute in question, besides fixing a rate of $1, provided as to such gas companies, * * * 'nor furnish in such city gas of a standard less than six hundred and fifty British thermal units per cubic foot, meas-

ured under normal conditions of temperature and atmospheric pressure.' Questions are herein raised whether this provision is constitutional, and whether it is separable from the rate provision.

"It is obvious that in giving consideration to a rate for gas there must be a particular standard of quality for which such rate is to be charged. In granting powers to the Public Service Commission, the Legislature, initially and by amendment, has provided: * * * 'The commission may, by order, fix just and reasonable prices, rates and charges for gas * * * notwithstanding that a higher or lower price has been theretofore prescribed by general or special statute, contract * * *' (section 72, Public Service Commission Law [Consol. Laws, c. 48, as amended by Laws 1920, c. 542, § 2, and Laws 1921, c. 134, § 49]), and 'have power by order to fix and change from time to time standards of the purity, illuminating power and heating power, and standards for the measurement thereof, of gas * * * notwithstanding that other standards * * * may have been fixed by general or special statute * * *' (section 66, subd. 3, as amended by Laws 1921, c. 134, § 39).

"The witnesses before me were unanimously of opinion that present-day use of gas requires a standard based upon heat content. In earlier days, when gas was used for lighting, chiefly with open flame burners, a candle power standard, or measure of light content, was the proper standard. A candle power standard prescribed by the Legislature was in effect throughout New York City until the Public Service Commission, by its orders of August 30, 1922, prescribed a heat standard and fixed such standard at a monthly average of 537 British thermal units per cubic foot, with a minimum of 525.

"The statutory powers of the commission and its orders as to such a standard remain in effect except as they may be limited by the statute herein in question. This statute undertook to fix a rate of $1 for gas of not less than 650 British thermal units. I have already found that the $1 rate would be confiscatory, based upon the furnishing of gas of a monthly average of 537 British thermal units as prescribed by the commission's order, and that the $1 rate would be confiscatory for gas furnished of a standard of 650 British thermal units as proposed by the statute. Two questions remain—whether the provisions as to the rate and the standard are separable, and whether compliance with the 650 British thermal unit provision is reasonable and practicable.

"Upon the question whether provisions for a rate and standard in the statute are intended to be regarded as inseparable, it may be pointed out that the Legislature of New York has never, except when fixing a rate, fixed a standard for gas, and it is not likely that it would have passed a statute containing only a provision as to a standard. It would appear that the Legislature intended to fix a rate for a certain standard, particularly when we consider that the provision as to a standard was inserted in the bill after its introduction. Had the Legislature intended to fix a rate for gas of a standard already fixed, or to be fixed by the commission, the amendment would not have been inserted. The rate and standard, therefore, were intended to be so tied together as to be inseparable, and that if one fell the statute failed.

"Considered independent of the rate limited by the statute, the standard fixed is void as an unreasonable, arbitrary, and destructive enactment, not warranted by the police power of the state. Four witnesses of extended experience in the gas business testified that it was not only altogether impossible for plaintiff to furnish its consumers anything like satisfactory service under the 650 British thermal unit standard, but that the furnishing of gas of such standard would be attended with hazards to life and property. They were Mr. Robert M. Searle, the president of the Rochester Gas & Electric Corporation, a consulting engineer of 39 years' experience in the gas business, including researches on the best method of making a useful high heat content gas; Mr. John F. Wing, engineer of research of the Boston Consolidated Gas Company, with American and European training in chemistry, and with 36 years' experience in the manufacture and distribution of gas; Mr. A. Gordon King, service engineer of the American Gas Association, a trade association representing 90 per cent. of the gas manufactured in America, a graduate of the City and Guilds of London Institute in gas manufacture and allied subjects, formerly gas engineer for the New York Public Service Commission for the Second District, and later gas engineer for the commonwealth of Pennsylvania, who for over 20 years has made tests and investigations as to the utilization efficiencies of gases in the respect to various degrees of heat content; and Mr. A. S. B. Little, formerly gas engineer of the Illinois Utilities Commission, a witness for the defendant Attorney General.

"According to the witnesses, gas of as high

heat content as 650 British thermal units has never been prescribed or supplied anywhere for general industrial and domestic uses. All witnesses agreed that efficient or satisfactory service is obtainable only by the furnishing of gas of a substantially uniform heat content. Gas is used in appliances that generally utilize the Bunsen burner, which Mr. Searle said was so devised as to consume the largest possible quantity of gas in the smallest possible flame area. It is essential that there be a suitable and proper premixture of gas and air which is admitted through a shutter into a chamber through which the gas passes to the tip of the burner. The quantity of air that should be admitted is dependent upon the heat content of the gas. It is obvious that, as the heat content of the gas varies, the mixture will not be balanced. When the heat content of the gas is increased without adjustment in the air shutter, a long yellow flame is produced, due to the insufficiency of air in the mixture, and the utensil to which the flame is applied is covered with a deposit of carbon. On the other hand, if the heat content of the gas is reduced, there is an oversupply of air, causing reduction in the flame area, and oftentimes a flareback in the air chamber, sometimes causing an explosion.

"If it is impossible to supply 650 British thermal units gas uniformly, there cannot be satisfactory or efficient service. Gas of 650 British thermal units cannot be manufactured at the works with the same degree of uniformity of heat content as gas of a lower heat content. An increase in heat content is effected through the use of additional gas oil. It appears that, to make gas of 537 British thermal units, for instance, requires approximately 2.83 gallons of gas oil per 1,000 cubic feet of gas made, while to make gas of 650 British thermal units would require at least 4.65 gallons of gas oil. Mr. Little testified that it would require at least 2 gallons more to make the higher heat-content gas. In the use of such large quantity of gas oil the witnesses say that it is impossible to make gas as stable or as uniform as when the smaller quantity of oil is used. When it is attempted to distribute and supply high heat-content gas, extreme and undesirable variations are met, due to the effect of varying temperature affecting gas in the holders and in the distribution system. The additional gas oil used produces in the gas a larger quantity of condensible hydrocarbons, which drop out of the gas as the temperature falls, causing the heat content to be lowered, and then, when the temperature rises, these are picked up and increase the heat content. These variations in heat content, not only produce an unsatisfactory service, but create hazards. Gas of 537 British thermal units may vary 5 per cent., or about 25 units, from the standard on delivery to consumer, which is stated to be the limit of utilization of appliances without readjustment; 650 British thermal unit gas might vary 100 British thermal units either way from the standard.

"Since October, 1922, plaintiff has furnished gas in compliance with the order of the commission of August 30, 1922, prescribing an average of 537, and a minimum of 525, British thermal units per cubic foot. The appliances of plaintiff's consumers are adjusted or suited to utilize such gas, and consist mainly of gas ranges and water and room heaters. While the larger part of the appliances have adjustable burners, they are not so simple or easy to adjust that it can be done by consumers themselves. The adjustment of burners is distinctly a function of men trained to that work. All of the witnesses are in agreement that it is entirely impracticable and impossible for plaintiff to furnish 650 British thermal unit gas unless and until the appliances are adjusted or adapted for such gas. Twenty-one per cent. of the appliances are not adjustable and would have to be discarded.

"Any attempt to adapt the adjustable appliances to gas of 650 British thermal units would require at least six months' time, for there would need to be, first, an adjustment to approximate 600 British thermal units and a raising of the gas manufactured to that point, and then an adjustment for the 650 with gas of that standard thereafter manufactured. The work would have to be done in two stages, because it is impossible to change at once from a 537 gas to a 650 gas, because of the great difference between these standards. The need of a considerable period of time in which thus to adjust appliances and to make other changes is well known to commissions and others familiar with the gas business. The Legislature, however, provided that its statute, proposing that the standard should be changed from the existing standard fixed by the commission at 537 British thermal units to 650 British thermal units, should take effect immediately. The companies were thus apparently expected to comply forthwith, in disregard of physical facts, or suffer the penalties of violation of a provision of law. The temporary injunction herein, however, permitted the plaintiff

to continue under the standard fixed by the commission pending the outcome of this suit.

"Regardless, however, of immediate compliance, it is to be observed that such a substantial raising of the heat content would require adjustment of appliances. Many appliances could not be adjusted and would need to be scrapped. Furthermore, the plaintiff contends that no duty is imposed upon it, or legal right given to it, to enter the premises of consumers to adjust appliances, or to compel the discarding of nonadjustable appliances, nor is there any legal obligation requiring consumers to adjust their own appliances, or to have appliances that will utilize efficiently gas of a prescribed standard. A mere notice from the company to consumers to adjust or obtain appliances suitable to gas to be furnished would be ineffective. Yet, if all appliances were not proper in adjustment, danger would follow from an attempt by the company to furnish gas that would not be properly utilized. The Legislature has not provided a procedure that will permit assurance of properly adjusted appliances. Without such assurance, compliance with the proposed standard would be dangerous to life and property, a responsibility that the Legislature could hardly have intended. Incidentally, gas of such a standard, as has been indicated above, would result in unsatisfactory and inefficient service, because of wide variations in quality, even if all appliances were set for 650 British thermal units.

"Such a regulation would seem to be beyond the proper police power of the state. Analogous is the holding of the Supreme Court in Willcox v. Consolidated Gas. Co., 212 U. S. 19, 53, 29 S. Ct. 192, 200 (53 L. Ed. 382, 48 L. R. A. [N. S.] 1134, 15 Ann. Cas. 1034), as to a regulation as to pressure, where it is said:

" 'The evidence shows that to put a pressure such as is demanded by the acts upon the mains and other service pipes in their present condition would be to run a great risk of explosion, and consequent disaster. Before compliance with this provision would be safe, the mains and other pipes would have to be strengthened throughout their whole extent, and at an expenditure of many millions of dollars, from which no return could be obtained at the rates provided in the acts. This would take from the complainant the ability to secure the return to which it is entitled upon its property used for supplying gas, and the provision as to the amount of pressure is therefore void.'

"And also South Covington Railway. v.

Covington, 235 U. S. 537, 548, 549, 35 S. Ct. 158, 161 (59 L. Ed. 350, L. R. A. 1915F, 792), where the court said:

" 'As to the regulation affecting the temperature of the cars, and providing that they shall never be permitted to be below 50° Fahrenheit, the undisputed testimony shows that it is impossible in the operation of the cars to keep them uniformly up to this temperature, owing to the opening and closing of doors, and other interferences that make it impracticable. We therefore think, upon this showing, this feature of the ordinance is unreasonable and cannot be sustained.'

"Burns Baking Co. v. Bryan, 264 U. S. 504, 515, 516, 44 S. Ct. 412, 414 (68 L. Ed. 813, 32 A. L. R. 661), is one of the latest expressions of the United States Supreme Court on this subject, holding certain restrictions on the weight of bread to be unreasonable and arbitrary and repugnant to the Fourteenth Amendment. The court there said:

" 'As indicated by the opinion of the state Supreme Court, ingredients selected to lessen evaporation after baking would make an inferior and unsalable bread. It would be unreasonable to compel the making of such a product, or to prevent the making of good bread in order to comply with the provisions of the act fixing maximum weights. The act is not a sanitary measure.'

"These and other rulings of the courts hold that a police regulation cannot be arbitrary, but must be just and reasonable, and within the requirement that it shall properly protect the lives, health, morals, or welfare of a community. The plaintiff, in harmony with efforts of the industry, has attempted to furnish gas of a quality best suited to present-day needs of its public, and in accordance with the findings of the Public Service Commission, which, as an expert agency of the state, has kept itself informed upon such matters. The action of the Legislature in thus attempting to make effective an arbitrary standard, condemned by expert witnesses on both sides, and productive of danger, with no compensating advantages, has, in my opinion, gone beyond its power, and its enactment should be held unconstitutional and void.

"Conclusion.

"The views herein expressed and the conclusions reached indicate so clearly that the proposed rate is confiscatory, as well as the proposed standard arbitrary and beyond the police power to enact, that there would seem

no room for argument that the company should have experimented under the new rate and presumably with the new standard. I am unable to find any case that would require a trial period of the statute before questioning its validity, with the facts so clear as to actual operating expenses and results so serious from an attempt to change to the proposed standard.

"I have made formal findings of fact and conclusions of law, which are attached and submitted herewith. A correct transcript of the testimony and copies of the exhibits, together with a stipulation of the various solicitors, waiving the signatures of the witnesses to their several depositions, and further waiving the filing of the original exhibits marked in evidence, are also filed herewith. Upon the proofs as taken I find and report as follows:

### "Findings of Fact.

"1. Plaintiff was duly incorporated on the 26th day of May, 1904, under the Transportation Corporations Law of the state of New York, and since July 1, 1904, has been and still is engaged in the business of manufacturing, furnishing, and selling gas for public and private use in the territory comprising the Thirtieth ward and a small part of the Thirty-First ward of the borough of Brooklyn in the city of New York, which is a city containing a population of 1,000,000 or more.

"2. The Kings County Gas & Illuminating Company was incorporated December 17, 1889, under chapter 40 of the Laws of 1848, and the several acts amendatory thereof and supplementary thereto, and on or about December 26, 1889, received the consent of the municipal authorities of the town of New Utrecht, Kings county, to lay conductors for conducting gas through the streets, lanes, alleys, and squares in said town. Said Kings County Gas & Illuminating Company commenced supplying gas for public and private use on or about September 1, 1891, and continued to supply the same until its merger with the plaintiff July 1, 1904. Pursuant to the provisions of chapter 451, Laws of 1894, the territory comprising the town of New Utrecht on July 1, 1894, was added to the city of Brooklyn as the Thirtieth ward thereof, and since January 1, 1898, has been, and now is, the Thirtieth ward of the borough of Brooklyn, city of New York.

"3. On July 1, 1904, plaintiff, being then the owner of all the issued and outstanding capital stock thereof, duly merged into and with itself said Kings County Gas & Illuminating Company in accordance with the provisions of the Stock Corporation Law of the state of New York, and thereupon acquired and became, and since has been, possessed of all its estate, property, rights, privileges, and franchises.

"4. Plaintiff has issued and outstanding in the hands of the public $750,000 of 5 per cent. first mortgage bonds, due October 1, 1940, and $2,389,000 of 5 per cent. and $1,822,000 of 6½ per cent. first refunding mortgage bonds, due October 1, 1954. Plaintiff has issued and outstanding 50,000 shares of common capital stock of no par value, and $500,000, par value, of 8 per cent. cumulative preferred stock. Since January 1, 1924, plaintiff has obtained subscriptions in the amount of $702,400 to an issue of 7 per cent. cumulative preferred stock, two-thirds of which subscriptions were from its customers and employees. At May 8, 1924, such subscriptions to the amount of $429,900 had been paid in full, and $95,169.50 had been received on account of the balance of the subscriptions.

"5. The credit balance in the contingency reserve on plaintiff's books at December 31, 1922, was $256,695.72, and at December 31, 1923, it was $292,689.21. Its bond amortization reserve at December 31, 1923, had a credit balance of $38,189.09, its uncollectible bill reserve a credit balance of $5,000, and its retirement reserve a credit balance of $201,910.62.

"6. Plaintiff owns a piece or parcel of land bounded on the east by First avenue, on the north by the south line of Fifty-Fourth street and the center line of Fifty-Fourth street extended, on the west by New York Bay, and on the south by the center line of Fifty-Fifth street extended, in the borough of Brooklyn, having a total area of 462,208 square feet, 295,855 square feet being uplands, and 166,353 square feet being lands under water outside the bulkhead line, the present fair market value of which land, without improvements, is $1,141,344. Plaintiff's gasworks or manufacturing plant is located upon the lands above described, and 231,381 square feet of the upland and 55,073 square feet of the lands under water are used by the plaintiff in the conduct of its business, the present fair market value of which land, without said improvements, is $811,650.

"7. Plaintiff owns four parcels of land at Ninth avenue and Sixty-Fifth street, on which are located its gas holders, shops, and yards. The parcel at the northwest corner of Ninth avenue and Sixty-Fifth street has an area of 18,000 square feet, the present

fair market value of which parcel, without improvements, is $23,750. The parcel at the northeast corner of Ninth avenue and Sixty-Fifth street has an area of 4,001 square feet, the present fair market value of which parcel, without improvements, is $6,300. The parcel at the southwest corner of Ninth avenue and Sixty-Fifth street has an area of 109,017 square feet, the present fair market value of which parcel, without improvements, is $138,771. The parcel at the southeast corner of Ninth avenue and Sixty-Fifth street has an area of 8,825 square feet, the present fair market value of which parcel, without improvements, is $13,531.

"8. Plaintiff's manufacturing works are equipped with seven gas generators of a combined rated capacity of 17,400,000 cubic feet of gas per 24 hours. Its gas storage holders have a capacity of 2,500,000 cubic feet. Plaintiff, on June 1, 1923, had approximately 205 miles of gas mains laid in the streets, avenues, and public places of said Thirtieth and Thirty-First wards, consisting of 1,076,410 feet of cast iron mains, ranging in sizes from 3 inches to 20 inches, 6,361 feet of wrought iron mains, ranging in sizes from 1 inch to 3 inches, and 814 feet of wrought steel mains, ranging in sizes from 4 inches to 18 inches. On June 1, 1923, plaintiff's said gas mains were connected to the premises of its consumers by 26,168 service pipes, of a combined length of 1,217,866 feet, and on that date plaintiff had installed on the premises of said consumers 50,717 gas meters.

"9. The cost of reproducing the manufacturing plant, distributing system, and all other structural property owned and used by the plaintiff in its gas business as of June 1, 1923, at prices for labor and material then prevailing, exclusive of the cost of restoring street pavement over gas mains and gas service pipes, was and is at least the sum of $8,059,417, classified as follows:

| | |
|---|---:|
| Buildings | $　752,134 |
| Manufacturing apparatus and equipment and gas holders | 1,590,291 |
| Gas mains in streets | 2,898,617 |
| Gas service pipes | 1,109,686 |
| Gas meters on customers' premises and in stock | 816,870 |
| Engineering, superintendence, and general contractor's expense and profit | 317,536 |
| Interest during construction | 421,623 |
| Taxes during construction | 25,646 |
| Administration, legal and miscellaneous general expenses during construction | 127,014 |
| | $8,059,417 |

"10. The plant, machinery, and equipment of the plaintiff have been well maintained, repairs, renewals, and replacements having been made as required. Said plant, machinery, and equipment are in as efficient operating condition for the economical production of gas as if new. The uncontradicted evidence shows that an expenditure of $1,855.50 on the buildings and $16,557.92 on the machinery, apparatus, and equipment, as of June 1, 1923, would put the same in a condition substantially as good as they were when new. These amounts deducted from the reproduction cost of the structural property give a reproduction value of $8,041,003.

"11. The cost to restore the street pavement then existing over the gas mains and gas service pipes of plaintiff as of June 1, 1923, at prices for labor and material then prevailing, was and is at least the sum of $1,639,333, made up as follows:

| | |
|---|---:|
| Contract price | $1,444,347 |
| Engineering, superintendence, and miscellaneous expenses | 108,326 |
| Interest during construction | 86,660 |
| | $1,639,333 |

"12. To June 1, 1923, plaintiff had expended the sum of $97,696.65 in the restoration of street pavement necessarily cut in the laying of gas mains and gas service pipes in the extension from time to time of its distribution system.

"13. As of June 1, 1923, plaintiff owned and used in its gas business miscellaneous general equipment, consisting of laboratory apparatus, office and storeroom furniture and fixtures, stable and garage vehicles and accessories, and small tools, which had cost the sum of $102,541.

"14. Between June 1 and December 31, 1923, plaintiff expended for additions, extensions, and improvements to its manufacturing plant and distributing system the sum of $565,414.25 in excess of the cost of all property withdrawn from service during said period.

"15. The territory served by plaintiff is a rapidly growing section of New York City, and to meet the increase in demand for gas plaintiff has been obliged to enlarge its manufacturing facilities, extend its mains, and install additional new gas service pipes and meters each year. Plaintiff installed at new locations 4,029 meters in 1921, 5,665 meters in 1922, 7,086 meters in 1923, and 2,744 meters in the first 4 months of 1924, having on the premises of its consumers at April 30,

1924, a total of 58,653 meters. The estimated expenditures of plaintiff for main extensions, services, and meters from January 1 to December 31, 1924, were $521,786.18.

"16. Due to the increased and increasing demand upon plaintiff's plant and facilities, it is necessary for plaintiff to enlarge its gas-storage capacity, and plaintiff has entered into a contract for the construction of a 5,-000,000 cubic foot gas holder on its lands at Ninth avenue and Sixty-Fifth street, costing approximately $450,000.

"17. In 1923 plaintiff entered into a contract for, and commenced, the construction on its lands at Ninth avenue and Sixty-Fifth street of a booster station, necessary adequately to distribute under suitable pressure the constantly increasing supply of gas to outlying districts within its territory. Expenditures estimated to amount to $148,674.-96 were required to be made in 1924 to complete the work under said contract.

"18. Plaintiff has never owned an office building, but has rented office space for its officers and clerical force. Due to the growth of its business and the consequent increase in its office requirements, the quarters occupied by plaintiff for several years past have become entirely inadequate. Plaintiff has acquired a site on which to construct an adequate office building, the estimated cost of which is $550,000.

"19. The average monthly working capital employed by the plaintiff in the year ended December 31, 1923, was $868,372.47, made up of the average monthly capital in the following accounts:

| | |
|---|---:|
| Accounts receivable | $303,988.60 |
| Material and supplies | 219,233.80 |
| Cash | 195,142.20 |
| Gas supplied, but not billed | 125,000.00 |
| General storeroom suspense | 12,162.40 |
| Coal-handling suspense | 649.68 |
| Prepaid insurance | 5,837.41 |
| Prepaid taxes, etc. | 5,358.38 |
| Deposits—public authorities, performance of contracts | 1,000.00 |
| | $868,372.47 |

"The reasonable and necessary working capital employed by plaintiff in its gas business since January 1, 1923, has been, and is, at least $600,000.

"20. Plaintiff's gasworks, plant, and system is a complete, connected, established, and operating property, doing business and earning money, and the element of going concern value therein is a property right, independent of the franchise, or of any mere good will as between such plant and its consumers, and such element of going concern is of the fair and reasonable value of $800,000.

"21. The land upon which plaintiff's gas holders, shops, and yards are located, as aforesaid, was acquired by the Kings County Gas & Illuminating Company in 1890 at a cost of $20,000, and the land upon which plaintiff's manufacturing works are located was acquired by said Kings County Gas & Illuminating Company in 1896 at a cost of $119,000. The total cost to the Kings County Gas & Illuminating Company of all the property owned by it and acquired by the plaintiff upon its merger July 1, 1904, as shown by the books of said Kings County Gas & Illuminating Company was $2,441,-997.40. The investment of plaintiff and its predecessor, with land at its then present market value, in the property owned by the plaintiff at December 31, 1923, exclusive of working capital, was $7,847,212.59, made up as follows:

| | | |
|---|---:|---:|
| Cost to Kings County Gas & Illuminating Company of property existing June 30, 1904 | $2,441,997.40 | |
| Less cost of land.. | 139,000.00 | $2,302,997.40 |
| Net additions to fixed capital, July 1, 1904, to December 31, 1923 | | 4,198,603.69 |
| Present value of land | | 1,345,611.50 |
| | | $7,847,212.59 |

"22. The fair and reasonable value of the land, manufacturing plant, distributing system, and all other property, tangible and intangible, owned and used by the plaintiff in its gas business, excepting its franchises, as of June 1, 1923, was and is the sum of $10,-635,242, and as of January 1, 1924, was and is the sum of $11,200,656, classified as follows:

| | |
|---|---:|
| Land | $ 994,002 |
| Manufacturing plant, distributing system, and other structural property | 8,041,003 |
| Restoring street pavement over mains and services cut by plaintiff in laying the same | 97,696 |
| Miscellaneous general equipment | 102,541 |
| Working capital | 600,000 |
| Going concern value | 800,000 |
| | $10,635,242 |
| Cost of additions to fixed capital, June 1 to December 31, 1923 | 565,414 |
| | $11,200,656 |

"23. The fair, reasonable, and proper rate of return on the value of the property which plaintiff owns, uses, and employs for the convenience of the public, to which plaintiff is entitled, and which is necessary in order that such return may equal that generally being made at the date and for the period of the inquiry in the city of New York on investments in other business undertakings, which are attended by corresponding risks and uncertainties, and which will be reasonably sufficient to assure confidence in the financial soundness of the plaintiff, and adequate under efficient and economical management to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties, was and is not less than 8 per centum per annum.

"24. In the year ended December 31, 1923, plaintiff manufactured 1,977,410,000 cubic feet of gas, and its sales were 1,794,969,872 cubic feet. The actual total cost to plaintiff, including the expenses incident to the sale of gas appliances, in manufacturing and distributing said gas, was $1,640,279.49, or 91.38 cents per 1,000 cubic feet of gas sold, made up as follows:

|  |  | Cts. Per M. |
|---|---:|---:|
| Production expenses.....$ | 892,501.13 | 49.73 |
| Distributing expenses.... | 143,636.40 | 8.00 |
| Street-lighting expenses.. | 915.94 | .05 |
| Commercial expenses..... | 124,461.36 | 6.93 |
| Promotion expenses...... | 49,423.58 | 2.75 |
| General expenses........ | 156,651.13 | 8.72 |
| Retirement expense...... | 53,990.21 | 3.00 |
| Federal income tax...... | 68,303.61 | 3.81 |
| Other taxes............. | 140,987.02 | 7.86 |
| Uncollectible bills........ | 9,409.11 | .53 |
| Total operating expenses..$ | 1,640,279.49 | 91.38 |

"25. The expenses incurred by plaintiff in the manufacture and sale of gas in the year ended December 31, 1923, stated in the preceding finding, do not include any charge for depreciation. The only charge made over and above the actual expense for repairs is 3 cents per 1,000 cubic feet of gas sold, to provide for the retirement of fixed capital or plant withdrawn from service, which for the purpose of this case I have reduced to 1½ cents. Such expenses do not include any charge or expenditures by the plaintiff for interest upon its bonds, temporary loans, consumers' deposits, or other indebtedness, and include no return upon the capital or property employed in any form whatsoever. The expenditures so made, as herein modified, were reasonable and necessary.

"26. Plaintiff's sales of gas for the year ended December 31, 1924, were 1,947,207,840 cubic feet, an increase of 152,237,968 cubic feet over the sales for 1923. Such increase in sales does not reduce the unit (1,000 cubic feet) cost of manufacturing and distributing gas. Reductions in the unit cost in 1924 are limited to those occasioned by the slightly lower costs of gas oil, which is the largest item in the expense of making gas, and generator fuel under existing contracts, which covered plaintiff's requirements for the year 1924. The average cost, including handling charges, of the gas oil per gallon, was 5.2089 cents in 1923, and 4.75475 cents in 1924. The average cost, including handling charges, of generator fuel per long ton, was $10.062 in 1923, and $9.9673 in 1924. The gas oil and generator fuel used in 1923 at the contract prices for 1924 would have cost $28,298.50, or 1.58 cents per 1,000 cubic feet of gas sold, less than was actually paid for the same, making the cost to produce and distribute gas, exclusive of federal income tax and by reducing the retirement expense to 1½ cents, 84.50 cents per 1,000 cubic feet of gas sold.

"27. Since October 1, 1922, plaintiff has supplied gas in compliance with an order of the Public Service Commission of the state of New York dated August 30, 1922, fixing a monthly average of 537, and a minimum of 525, British thermal units per cubic foot. The gas furnished by plaintiff, as tested by the Public Service Commission, in the 12 months of 1923 showed the following monthly averages in British thermal units per cubic foot: 538, 546, 553, 549, 545, 547, 550, 558, 548, 547, 543, and 543.

"28. In the manufacture of gas in 1923 plaintiff used 2.83 gallons of gas oil, 33.98 pounds of generator fuel, and 5.24 pounds of solid boiler fuel per 1,000 cubic feet of gas made. The increase in the heat content of gas is effected through the use of additional gas oil, resulting in a slight reduction in the quantities of generator and boiler fuel required, and an increase in the amount of water gas tar recovered. To furnish gas of 650 British thermal units, tested one mile from the plant, would require not less than 4.65 gallons of gas oil, 32 pounds of generator fuel, and 3.98 pounds of solid boiler fuel per 1,000 cubic feet of gas made. In plaintiff's actual operations, with the use of 2.83 gallons of gas oil per 1,000 cubic feet of gas made, an average of 8 per cent. of the gas oil is recovered as water gas tar, but with the use of 4.65 gallons of gas oil per 1,000 cubic feet in the manufacture of the higher heat content gas, the recovery would approximate

16 per cent. of the gas oil used, or an increase of approximately .47 of a gallon of water gas tar per 1,000 cubic feet of gas made. The increase in the cost of furnishing gas of 650 British thermal units per cubic foot, instead of the gas furnished by plaintiff since January 1, 1923, at the present prices of material, is not less than 5.44 cents per 1,000 cubic feet of gas sold, computed as follows:

| | | | |
|---|---|---|---|
| 1.82 additional gallons gas oil at 4.75475 cents | | | 8.65 cents |
| 1.98 less pounds generator fuel at .469 cents | .89 cents | | |
| 1.26 less pounds solid boiler fuel at .415 cents | .54 " | | |
| .47 additional gallons water gas tar recovered at 4.75475 cents... | 2.23 " | 3.66 " | |

| | | |
|---|---|---|
| Net increase in cost per 1,000 made | 4.99 " | |
| Net increase in cost per 1,000 sold | 5.44 " | |

"29. Had a rate of $1 per 1,000 cubic feet for gas of the standard furnished by plaintiff been enforced against plaintiff, there would have been available for return upon the property employed by plaintiff for the year ended December 31, 1923, but $329,028.01, computed as follows:

| | | Cts. Per M. |
|---|---|---|
| Sales of gas at $1 per 1,000 | $1,794,969.87 | 100.00 |
| Miscellaneous operating revenue | 81,958.28 | 4.57 |
| Total operating revenue.. | $1,876,928.15 | 104.57 |
| Operating costs, exclusive of federal income tax... | 1,545,051.33 | 86.08 |
| Income applicable to federal income tax and return on property | $ 331,876.82 | 18.49 |
| Bond interest income deduction .....$275,380.00 | | |
| Other income deductions .. 33,706.35 | 309,086.35 | 17.22 |
| $ | 22,790.47 | 1.27 |
| Federal income tax | 2,848.81 | .16 |
| Income available for return on property | $ 329,028.01 | 18.33 |

"30. No federal income tax would have been payable by plaintiff for the year ended December 31, 1923, had plaintiff furnished gas of 650 British thermal units at the rate of $1 per 1,000 cubic feet, and there would

have been available for return upon the property employed by plaintiff but $234,230.26, computed as follows:

| | | Cts. Per M. |
|---|---|---|
| Sales of gas at $1 per 1,000 | $1,794,969.87 | 100.00 |
| Miscellaneous operating revenue | 81,958.28 | 4.57 |
| Total operating revenue.. | $1,876,928.15 | 104.57 |
| Actual operating costs, exclusive of federal income tax | 1,545,051.33 | 86.08 |
| Increase in costs for 650 B. t. u. gas | 97,646.56 | 5.44 |
| Total operating expenses exclusive of federal income tax | $1,642,697.89 | 91.52 |
| Income applicable to federal income tax and return on property | $ 234,230.26 | 13.05 |
| Income deductions | 309,086.35 | 17.22 |

"31. Had a rate of $1 per 1,000 cubic feet for gas of the standard furnished by plaintiff been enforced against plaintiff, the probable revenue available for return upon the property employed by plaintiff for the year ended December 31, 1924, would not have exceeded $374,439.38, computed as follows:

| | Amount | Cts. Per M. |
|---|---|---|
| Sale of gas at $1 per 1,000 | $1,947,207.84 | 100.00 |
| Miscellaneous operating revenue | 81,958.28 | 4.21 |
| | $2,029,166.12 | 104.21 |
| Operating expenses, exclusive of federal income tax | 1,645,390.59 | 84.50 |
| Income available for federal income tax and return on property | $ 383,775.53 | 19.71 |
| Income deductions: Interest on bonds ....$275,380.00 | | |
| Other income deductions. 33,706.35 | 309,086.35 | 15.87 |
| $ | 74,689.28 | 3.84 |
| Federal income tax | 9,336.15 | .48 |
| Income available for return on property | 374,439.38 | 19.23 |

"32. No federal income tax would have been payable by plaintiff for the year ended December 31, 1924, had plaintiff furnished gas of 650 British thermal units at the rate of $1 per 1,000 cubic feet, and the probable revenue available for return on the property employed by plaintiff would not have exceeded $277,847.39, computed as follows:

| | Amount | Cts. Per M. |
|---|---|---|
| Sale of gas at $1 per 1,000 ............... | $1,947,207.84 | 100.00 |
| Miscellaneous operating revenue ............. | 81,958.28 | 4.21 |
| | $2,029,166.12 | 104.21 |
| Operating expenses, exclusive of federal income tax ................. | 1,751,318.73 | 89.94 |
| Income available for federal income tax and return on property....... | $ 277,847.39 | 14.27 |
| Income deductions: | | |
| Interest on bonds ...$275,380.00 | | |
| Other income deductions .. 33,706.35— | 309,086.35 | 15.87 |

"33. At no time since the enactment of chapter 899 of the Laws of 1923, would the rate of $1 per 1,000 cubic feet for gas of the standard supplied by plaintiff have yielded a return of as much as 3½ per cent. per annum on the fair value of the property employed by plaintiff in the public service. At no time since the enactment of said chapter would the rate of $1 per 1,000 cubic feet for gas of the standard prescribed thereby have yielded a return of as much as 2½ per cent. per annum on the fair value of the property employed by the plaintiff in the public service. The rate of $1 per 1,000 cubic feet for gas, whether of the heat content actually supplied by plaintiff, or of the heat content prescribed by said act, was and is confiscatory, and will continue to be so.

"34. Efficient and satisfactory service can only be rendered by plaintiff, or by any other gas company, by supplying its consumers with gas of a substantially uniform heat content. Gas appliances will not ordinarily allow for a variation of more than 25 British thermal units either way from the mean heat content for the utilization of which they are adjusted. Gas of as high heat content as that prescribed by chapter 899 of the Laws of 1923 has never been supplied anywhere for general industrial and domestic uses, and it is uncertain with what degree of uniformity of heat content it could be produced at the manufacturing plant, but it is certain that it could not be produced with the same degree of uniformity as gas of a lower heat content such as that prescribed by the order of the Public Service Commission dated August 30, 1922. Gas of the higher heat content contains larger percentages of condensible hydrocarbons than gas of the lower heat content, and even if it were produced with a fair degree of uniformity at the plant it would necessarily be affected by changing temperature conditions in the holders and street mains, producing wide variations in the heat content, and consequent inefficient and unsatisfactory service. Variations in heat content might be as many as 200 British thermal units, and become a real hazard and menace to the lives and health of the inhabitants. When gas having a heat content of 30 British thermal units per cubic foot more than the appliances are adjusted to consume is applied to cooking utensils, incandescent lighting mantles, the interior of ranges and other heated surfaces, such as boiler tubes and water heater coils, the combustion is incomplete, thereby causing such heated surfaces to become coated with an increasing deposit of carbon, which reduces the efficiency of the gas flame, and causes serious hazards to life by the release of poisonous gases.

"35. At the time of the enactment of chapter 899 of the Laws of 1923, the gas appliances of plaintiff's consumers were, and still are, adapted or adjusted to utilize economically and efficiently gas of an average of 537 British thermal units per cubic foot, with a variation of 25 British thermal units above or below said average. Were it possible to supply gas of as high heat content as that prescribed by said chapter, without producing wide variations in the heat content of the gas supplied, and without a resulting unsatisfactory service, it would still be necessary, before plaintiff undertook to furnish gas conforming to such standard, to have all the various gas appliances used by plaintiff's consumers changed and adjusted, so as to adapt them to the use of such gas; otherwise, there would result great loss of life and property from asphyxiations and explosions. Many of the appliances in use in plaintiff's district are not adjustable, and would have to be discarded, requiring the purchase by plaintiff's consumers of new appliances. No obligation is cast upon the plaintiff by any statute or rule of law to enter upon the premises of its consumers and adjust their appliances for the utilization of gas of any particular standard, nor is a practicable means prescribed anywhere to bring about the adjustment of the consumer's appliances, and the purchase of new ones where necessary, so as to make it possible or safe now, or hereafter, for plaintiff to undertake the furnishing of gas of the heat content prescribed by chapter 899 of the Laws of 1923.

"36. It is within the recognized police power of the state, either by statute or regulation of a duly authorized commission, to

prescribe a standard for gas supplied for general industrial and domestic uses; otherwise, uniformity in heat content so essential to satisfactory and efficient service would be unenforceable. Also the power of regulating the rate or price necessarily carries with it the power or right to prescribe the standard or quality of the gas. But the exercise of this power, like every other power, must be reasonable and in the interests of the public by way of safeguarding the health, protecting the morals, or promoting the general welfare of the community. The requirement of chapter 899 of the Laws of 1923 to the effect that plaintiff shall not "furnish gas of a standard less than six hundred and fifty British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure" neither safeguards the health, protects the morals, nor promotes the general welfare; but, on the contrary, the furnishing of gas of such heat content would tend to, and actually would, imperil the life and health of the inhabitants, and subject their property to unnecessary risks and hazards. Not one advantage either to plaintiff or to its consumers, individually or collectively, is secured by such a requirement. Compliance with the requirement is impracticable and impossible. Attempted compliance would only result in inefficient service, and consequent dissatisfaction on the part of plaintiff's consumers, engendering a prejudice among them against plaintiff over a situation beyond its control, and plaintiff would suffer irreparable injury and damage in the loss of the good will of its consumers.

"I therefore recommend:

"1. That it be adjudged and decreed that chapter 899 of the Laws of 1923 of the state of New York, in so far as it limits the rate to be charged for gas supplied by plaintiff in the territory served by it, is confiscatory, and deprives plaintiff of its property without due process of law, contrary to the Fourteenth Amendment to the Constitution of the United States.

"2. That it be adjudged and decreed that the enforcement of said statute, in so far as it prescribes a rate or price to be charged for gas supplied by plaintiff, be in all respects suspended and restrained.

"3. That it be adjudged and decreed that chapter 899 of the Laws of 1923, in so far as it prescribes that plaintiff shall not furnish gas of a standard less than 650 British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure, is not a reasonable exercise of the police power of the state in respect to prescribing the standard for gas supplied

or to be supplied by the plaintiff, and deprives the plaintiff of its property without due process of law, contrary to the Fourteenth Amendment to the Constitution of the United States.

"4. That it be adjudged and decreed that defendants William A. Prendergast, William R. Pooley, Charles Van Voorhis, George R. Lunn, and George R. Van Namee, constituting the Public Service Commission of the state of New York, and Albert Ottinger, as Attorney General of the state of New York, and each of them, their and each of their successors, attorneys, agents, assistants, deputies, servants, and employees, be, and each of them be, restrained and enjoined from enforcing the provisions, or any of them, of said chapter 899 of the Laws of 1923, and from instituting, or causing to be instituted, any suit, action, or proceeding to enforce the said statute, or any provision thereof, or from taking any action under any other statute or law of said state to compel or enforce obedience to the said statute, or any provision thereof, and from interfering with plaintiff in charging, billing, and collecting a rate or charge in excess of that fixed by said statute for gas supplied to its consumers, other than the city of New York, and from interfering with plaintiff in furnishing and supplying gas of a standard or quality different from that fixed by said statute."

Samuel F. Moran and John D. Monroe, both of New York City, for plaintiff.

Charles G. Blakeslee, of Binghamton, N. Y., and Sherman C. Ward, of Albany, N. Y., for Public Service Commission.

William Hayward, John Holley Clark, Jr., and Anthony P. Ludden, all of New York City, for the Attorney General.

Before MANTON, Circuit Judge, and CAMPBELL and INCH, District Judges, holding court pursuant to section 266 of the Judicial Code (Comp. St. § 1243).

MANTON, Circuit Judge. This suit seeks to have declared as unconstitutional and void chapter 899 of the Laws of 1923, which reads as follows:

"A gas corporation engaged in the business of manufacturing, furnishing or selling illuminating gas in a city containing a population of one million or over shall not charge or receive for gas furnished or sold in such city a sum per one thousand cubic feet in excess of one dollar, nor furnish in such city gas of a standard less than six hundred and fifty British thermal units per cubic foot, measured under normal conditions of temperature and atmosphere pressure.

The Public Service Commission, notwithstanding any other provision of this chapter, shall not allow a rate or charge in the case of such cities in excess of such sum."

This became effective June 2, 1923. It fixed the maximum price of $1 per 1,000 cubic feet, and a minimum standard of 650 British thermal units per cubic foot, for gas supplied in the territory served by the plaintiff. A temporary restraining order was granted by the District Court on the plaintiff's application on June 6, 1923, and, after issue was joined, the special master took testimony and reported that the act was unconstitutional: (1) Because the rate fixed by the statute, if held enforceable, would result in confiscation of plaintiff's property; and (2) because the standard set by the statute of 650 British thermal units per cubic foot was impracticable and unsafe, and contrary to the power of the Legislature to pass legislation under its police power.

The special master took considerable testimony as to values of land and plant, working capital, and going value, and reached the conclusion that on December 31, 1923, the fair value of plaintiff's business was $11,-200,657. He found that the operating expense of manufacturing gas for this plant was 91.38 per 1,000 feet of gas sold, and he ruled that to sell gas at $1 per 1,000 cubic feet, as provided by the statute, amounted to a confiscation. He found that the standard of gas actually furnished was 537 British thermal units, and recommended that an 8 per cent. return on the fair value should be allowed in fixing the rate at which the gas should be sold. He held that the provisions for a rate and standard in the statute was intended to be inseparable, and that the Legislature intended, in fixing the rate, to fix a standard of gas to be charged for at that rate. He held that to fix such a rate was unreasonable, arbitrary, and a destructive enactment, not warranted by the police power of the state. These conclusions are challenged by both the Attorney General and the Public Service Commission, by exceptions which each have filed against the special master's report. Plaintiff has also filed exceptions, which are now withdrawn.

The principal objections urged are (1) that the plaintiff has not sustained the burden of proof of establishing that the rate fixed by the Legislature amounts to a confiscation of property, and that the requirement of 650 British thermal units is impossible of performance and impracticable in giving service to the public in the territory served by it; (2) that error was committed in fixing the fair value of the property invested and used

by the plaintiff in its business at $11,200,-656, and (3) in failing to make proper reductions for depreciation; (4) that it was error in the calculations to make an allowance of $800,000 for going value; (5) that it was error to find that the rate and standard provisions of the chapter were dependent upon each other; and that the court erred in failing to declare them separable, so that the standard provision may remain as constitutional, even though the rate provision be declared unconstitutional by the court.

[1, 2] We have examined this record, which is voluminous, and are satisfied that the master's conclusion of the fair and reasonable value of the land, manufacturing plant, distributing system, and other property, both tangible and intangible, used and owned by the plaintiff in its gas business, except its franchises, was properly fixed at $11,200,656 as of December 31, 1923. As stated by the Supreme Court: "The ascertainment of that value [fair value] is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment, having its basis in a proper consideration of all relevant facts." Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Willcox v. Consolidated Gas. Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; Georgia Ry. & Power Co. v. R. R. Com'n, 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144. And it is now settled by many authorities that rates which are not sufficient to yield a reasonable return upon the value of property used, at the time it is being used to render the services, are unjust, unreasonable, and confiscatory, and their enforcement deprives the public utility company of its property, in violation of the Fourteenth Amendment.

[3] The master has found that the cost of reproduction of the structural property owned and used by the plaintiff as of June 1, 1923, at the prices then prevailing, exclusive of the restoring pavement over mains and services, was at least the sum of $8,059,417. He found from the evidence that the property had been well maintained and was in an efficient state of repair and operating condition, and that it would require an expenditure of only $18,413.43 to put it in condition which was substantially as good as new. To this conclusion exception is taken. The argument is that it is wrong to say that by so slight a repair the property would have a value as if new. The plaintiff offered proof as to these values; the defendants did not. The master has not accepted the full value

as the proof of the plaintiff indicates, but has said: "I have endeavored to ascertain, and the figures found by me attempt to reflect, what it would have cost the plaintiff to build and develop its plant and property as it was built and developed, had the same level of prices for materials and labor prevailed throughout the whole period of its construction as prevailed in June, 1923; in other words, to measure and state the investment in the property in the dollar of the present." And he pointed out that the uncontradicted evidence was to the effect that, to organize a corporation, secure the necessary working capital, and construct the plaintiff's plant and property as it existed on June 1, 1923, but excluding going concern value, it would have cost $13,694,371.

As to the argument on depreciation, answering the argument of the defendants as to failure of the master to consider the depreciation in value, it will be observed that the plaintiff called a witness who testified quite fully on the subject of actual depreciation. He testified as to the condition of the property and plant, stating that it was in as good condition as a new plant, and that with this small expenditure referred to the property would be in as good a condition as if new, and as an operating plant, he stated, it would be better than new. There is testimony as to the observed depreciation and the defendants' witness made no deduction for accrued depreciation. While he said he had not time to examine every item of the property, as would be necessary for him to make an estimate of actual depreciation, it does appear that he had been through the plant, and he said there was new property, and that every repair reasonably required had been made. He said that the gasworks, holders, and shop buildings were well preserved and very well maintained. Other than this, we find that the defendants offered no evidence of depreciation.

[4] It is conceded that the plaintiff conducted its business with unusual skill and care. Under this condition of the proof, we agree with the master that, in fixing the amount of fair value as he did, sufficient has been allowed for depreciation. Denver v. Denver Water Co., 246 U. S. 178, 38 S. Ct. 278, 62 L. Ed. 649; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 35 S. Ct. 811, 59 L. Ed. 1244. Enhanced cost of construction, due to the general increase of costs after the erection of a plant, are to be considered in finding fair value. Bluefield Water Works Co. v. Public Service Commission, 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176; Galves-

ton Elec. Co. v. City of Galveston, 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678.

[5] The master, in fixing value of the plaintiff's business, allowed an item of $800,000 for going concern. In rate-fixing cases, such as we are considering here, the element of going concern is regarded as a property right, independent of the franchise or any mere good will. It must be considered in determining the value of the property upon which the owner has a right to make a fair return. Omaha v. Omaha Water Co., 218 U. S. 180, 30 S. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084; Denver v. Denver Water Co., supra; Des Moines Gas Co. v. Des Moines, supra. This going value of its property cannot be taken from it, except by due process of law. Plaintiff is entitled to the enjoyment thereof, and where it exists it must be considered in determining the reasonableness or unreasonableness of a rate charge, or where it is proposed to be charged.

The evidence fully warrants the conclusions of the master as to the amount of money required as a working capital.

[6-8] We think the language of the statute fixing the rate and fixing the standard are inseparable. They should be read together. To fix a standard which is not practicable, and, indeed, unsafe, is arbitrary and unreasonable exercise of the police power. The phrase, "nor furnish in such city gas of a standard less than 650 British thermal units per cubic foot, measured under normal conditions of temperature and atmospheric pressure," describes the character of the gas which is to be furnished at the rate of $1 per 1,000 feet. The rate fixed is the compensation for supplying this standard of gas. Four witnesses, thoroughly competent and experienced in the gas industry, gave testimony which in substance points out that there is danger or hazard in increasing the content of 650 British thermal units. The danger is pointed out as follows:

"Q. Occasioned by what circumstances? A. By the difficulty of maintaining a uniform quality, when you get into the high B. t. u. values; for instance, a sudden change in temperature, a hailstorm on a holder full of gas, would knock the B. t. u.'s down. If you were living up to a 650 B. t. u. standard, you would have to make immediately something much higher, and deliver adjacent to the plant a good deal more than 650, while on the outlying districts the variation would be very great; and close to the holder station it would be equally great, I think, because you cannot make gas and mix it thoroughly in a holder. It stratifies and short

circuits between inlet and outlet pipes, and some consumers close to the works might be getting 700 B. t. u. gas, and then within 24 hours they might be getting 600, and there is the danger."

They pointed out that there would be danger from the weak gas, but there would be more of a chance from the explosion in a variation of the quality of the high gas, and that it would not be practicable, so far as distribution is concerned, because of the necessary changes in the appliances. In view of this testimony, we think the conclusion of the master, holding that the standard prescribed is unreasonable and arbitrary, and that therefore the enactment is destructive, and not warranted by the police power of the state, finds support in the evidence and justifies our confirmation.

[9, 10] After the entry of the decree adjudging the statute to be in violation of the Constitution, the commission order of August 30, 1922, fixing a maximum rate of $1.-30 "on and after the 1st day of November, 1922, and until the 31st of October, 1923, and thereafter until the commission shall otherwise order, will continue to control the plaintiff. The plaintiff, of course, if so advised, may file its schedules with the Public Service Commission and petition for an increase in rate. But under Public Service Commission Law, § 66, subd. 12, it might charge a higher rate until the commission permits it. The master has suggested, as a reasonable rate of return, not less than 8 per cent. The master had in mind that any rate lower than 8 per cent. return would be confiscatory. But the master's report deals with present fair values. Of course, if, when the new rate is fixed, values have changed, the Public Service Commission may make such new rate based upon evidence, and will be wholly unhampered by the findings or recommendations of the master. Lincoln v. Lincoln, 250 U. S. 268, 39 S. Ct. 454, 63 L. Ed. 968. But we approve the values arrived at by the master, and likewise the recommendation as to the rate of return, below which, if a rate be fixed, would be confiscatory. It is upon these conclusions as to values that the master has found the statute confiscatory, and in this we agree.

The report is therefore approved and affirmed.

[Signed] MARTIN T. MANTON,
Circuit Judge.
MARCUS B. CAMPBELL,
District Judge.
ROBERT A. INCH,
District Judge.